S. Steinberg & Company v. Commissioner.
S. Steinberg & Co. v. Commissioner
Docket No. 106605.
United States Tax Court
1942 Tax Ct. Memo LEXIS 95; 1 T.C.M. (CCH) 73; T.C.M. (RIA) 42592; November 9, 1942
*95 F. E. Hagler, Esq., and Ed. M. Lowrance, Esq., for the petitioner. Frank M. Thompson, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The Commissioner determined an income tax deficiency of $9,989.55 for the fiscal year ended June 30, 1937. The matters in dispute are (1) whether the Commissioner properly disallowed the claimed deduction of a $10,000 bonus paid to petitioner's officers as additional compensation for services, and (2) whether petitioner's transactions in hide futures contracts were hedges, thereby entitling it to deduct in full the losses sustained thereon during the tax year. Findings of Fact Petitioner was incorporated on June 1, 1934. It is a dealer in hides, wool, furs and tallow, with a trade territory of Tennessee, Mississippi, Arkansas, Louisiana, Texas, Oklahoma and Alabama. Its return for the tax year was filed with the Collector for the district of Tennessee. Petitioner's stockholders, directors and officers, from the time of its organization through the tax year, were the following three individuals: No. of
Name
Position
Shares
Steinberg
President
10
Wolf
Secretary-Treasurer
10
Sewel
Vice President
980
*96 The annual salaries of these three officers were fixed by contracts with petitioner dated July 2, 1934, at $12,000, $9,000 and $4,000, respectively. The salary contracts were executed pursuant to an agreement with a bank (in connection with the bank's extension to petitioner of a $250,000 line of credit) that petitioner would not pay executive salaries in excess of $25,000 per annum. Petitioner continued in corporate form a business that had been started by Steinberg as an individual in 1905 and had been conducted since 1908 as a partnership, first between Steinberg and Wolf, and later by the admission of Sewel as a partner. Sewel is Steinberg's son-in-law. The bank requested the execution of the salary contracts because the officers had drawn sums in excess of $25,000 from the business as partners in prior years. Steinberg alone had drawn as high as $25,000 a year. At a regular meeting of the stockholders in January 1937, the salary contracts of July 2, 1934 were ordered renewed for the ensuing year, with the further provision that before the close of the 1937 fiscal year "such additional compensation for services rendered may be awarded in such amounts as the Board of Directors *97 shall elect." The Board of Directors, on June 30, 1937, awarded a bonus of $10,000 to the officers as additional compensation for services rendered, of which $4,666.67 was awarded and paid to Steinberg, $3,333.33 to Wolf, and $2,000 to Sewel. The permission of the bank to pay the bonus was sought and obtained. The net worth of petitioner had increased from $13,000 at the time of incorporation to approximately $67,000 on June 30, 1937. No dividends have ever been paid on petitioner's stock, and since its affairs have been conducted informally by the three individuals the stock itself has been considered as of no importance. Petitioner's net sales for the taxable year amounted to $1,532,774.14, as compared with net sales for the preceding year of $1,390,921.53. Its net income for the taxable year, after deducting $35,000 as compensation, was $8,067.18, compared with a net income for the preceding year, after deducting $25,000 as compensation, of $42,057.44. Its surplus, as shown by balance sheets attached to returns, increased from $15,027.77 on July 1, 1935, to $50,175.80 on June 30, 1936, and from that figure to $54,541.71 on June 30, 1937. During the fiscal year 1937 petitioner *98 sold approximately 7,500,000 pounds of hides. Of the net sales amounting to more than $1,500,000 in the tax year, approximately $500,000 represented fur sales. There had been a greater volume of business in prior years; in 1918 and 1919 the volume ran as high as $5,000,000 a year. Steinberg is well-known in the hide business and is considered to be as good a man in the industry as there is in his section of the country. He does the majority of the buying and selling for petitioner; grades and sorts the furs; attends fur auctions; supervises the curing and grading of hides; and pays close personal attention to the business. Wolf is the general manager of the plant and in charge of petitioner's office. He is in charge of the receipt and delivery of merchandise, and keeps the records. He also supervises the curing and grading of hides and goes out for contracts. He operates the business in Steinberg's absence. Sewel traveled extensively and contacted the trade in petitioner's territory. He worked in the warehouse during the fur season helping with the grading of furs, and also helped in the grading of hides. While traveling, he at times would pick up hides on the road and ship them direct *99 to the tanners. In Wolf's absence he supervised the office work. These three individuals devoted all their time to petitioner's business. They handled all the clerical work with the assistance of one stenographer. Hides and furs are bought in mixed grades of various kinds and must be selected and put into marketable grades. Most of petitioner's hides are sold to tanners, and each tanner requires a different grade of hides. The success of petitioner's business depends in large part upon the proper grading of hides. Grading of hides and furs is a highly specialized business requiring experience and judgment. During the fiscal year 1937 a reasonable compensation for the services of Steinberg was $16,666.67; Wolf, $12,333.33; and of Sewel, $6,000. Hides are a by-product of meat slaughter and consequently their production is but little affected by supply and demand. The price of beef, rather than of hides, controls the slaughter of cattle and the production of hides. The supply of hides is, therefore, fairly constant and can be anticipated further in the future than the demand. The demand for hides fluctuates a good deal as a result of many factors which are difficult, if not impossible *100 to predict with any degree of certainty. Hide dealers like petitioner build up their sources of supply over a period of years. Smaller dealers and producers must move their hides, but generally they cannot sell direct to tanners because they are unable to make up the different grades required by each particular tanner. Petitioner, therefore, and similar large dealers must continue to accept the hides from the smaller dealers with whom they trade, whether or not they have a present or known future outlet for them. By this practice large dealers insure a regular source of supply. They generally contract to take the accumulation of hides of a particular small dealer or producer over a period of 30 or 60 days at a guaranteed price. It is the practice of large dealers like petitioner, when they accept hides that are coming in from their suppliers and for which they are unable to find a demand and which therefore accumulate in their plants, to go to the hide exchange and sell hide futures as a protective measure. This is the only means they have to lessen the risk and reduce the hazard of the business. It is impossible for a hide man to hedge exact purchases against exact sales, because *101 the amounts he buys are indefinite. The accumulation of a particular small dealer during the time covered by his contract with petitioner may be 15,000 pounds or it may be 70,000 pounds. Petitioner is required to accept the accumulation, whatever it is, and generally at the price agreed upon in advance. Futures contracts, however, can be bought and sold only in lots of 40,000 pounds, which is considered one carload. A hide dealer, however, can approximate roughly the hides he has on hand and those he is likely to receive over a shor period of time, and govern his futures transactions accordingly. If the trend of the market is bad the dealer will hedge more, to secure protection for the total hides that he might acquire; whereas, if the trend is good he will often hedge less, taking a certain part of the risk himself. The hide exchange was organized in 1929 to afford dealers an opportunity to insure themselves against losses. Delivery of actual hides on futures transactions is impracticable and very seldom, if ever occurs. The reason is that the seller can make delivery of any grades of hides he chooses, and the buyer might get a grade for which he has no market. The purchasing and *102 selling of futures contracts is the only protection the hide dealers can have against price fluctuations and uncertainty of demand. Most hide dealers who transact a volume of business similar to petitioner's avail themselves of the hide futures market as a means of protection. When petitioner was granted a line of credit of $250,000 it was upon an understanding with the bank that petitioner would keep its position hedged with futures transactions. From time to time Steinberg discussed with an officer of the bank petitioner's position on the hide exchange, and the bank knew at all times the general extent of petitioner's transactions. The reason the bank required petitioner to engage in futures transactions was to have it secure protection from the hazards of the business, including price fluctuations. Petitioner, and the partnership before it, used the hide exchange futures market since it was created in 1929. Since the ceiling was placed on hides in June 1941 there has been no need of protection against fluctuations in price or lack of demand and petitioner has discontinued futures transactions. Neither petitioner nor the predecessor partnership ever dealt in futures in any commodity *103 except hides, nor did any of its officers. Its officers did not deal in hide futures individually. Petitioner's month to month position on the hide exchange during the taxable year was as follows: Month
Year
Position
Pounds
June
1936
Long
320,000
July
1936
Long
600,000
August
1936
Long
600,000
September
1936
Short
140,000
October
1936
Short
80,000
November
1936
Short
400,000
December
1936
Short
520,000
January
1937
Short
520,000
February
1937
Short
520,000
March
1937
Out
April
1937
Long
240,000
May
1937
Long
320,000
June
1937
Long
280,000 Petitioner sustained losses of $21,838.82 on its futures transactions during the tax year. The short position which was maintained from September through February coincided with an increased receipt of hides. Beginning with September in each year the killing of cattle is at its height and the receipt of hides from that month to January or February is much greater than at other times during the year. Petitioner sold approximately 7,500,000 pounds of hides during the year ended June 30, 1937, or a monthly average of around 600,000 pounds. Petitioner was never short on the futures market in *104 excess of one month's business. In the fall of 1936 the hide business began picking up. Prices were higher than in 1934 and 1935, but were fluctuating rather violently. One reason for the fluctuation was the fact that the Government had a large stock of hides hanging over the market that were the result of the killing of cattle during the drought of 1934 and 1935. About two hundred million pounds were in storage in the taxable year, and during the years 1936 and 1937 the Government parceled out these hides, once a month or every 60 days, generally in lots of one, five or ten million pounds. This would cause the market to drop, and as a result of the dumping of the Government hides, the hide business was unsettled during these years. The hide business is speculative and hide dealers generally, and petitioner specifically, used the facilities of the hide exchange during the taxable year to deal in futures as a protective measure against losses in the operation of their business. Petitioner's futures transactions were for the purpose of protection rather than speculation. Opinion ARUNDELL, J.: After weighing the facts and the opinion evidence presented in this proceeding, and taking *105 into consideration the presumptive correctness of the Commissioner's determination, we have concluded that the deduction claimed by petitioner, including the bonus of $10,000, was no more than reasonable compensation to its officers. Petitioner's success was dependent entirely upon the efforts of its three officers. In so far as petitioner was concerned all, or at least a major part, of its income was derived as a result of the bona fide services of these individuals, who devoted all their time to its welfare. The company prospered from the time of its incorporation, due primarily to the endeavors of these men. The compensation paid in the tax year was greater than in previous years, but it appears that a bank had limited the salaries payable so that a surplus could be established to protect its extension of credit. It is also true that the net income was less in the tax year than in the preceding year, a circumstance that hs been duly considered. This, however, is but one of the factors making up the whole picture, and in and of itself, the fact that the preceding year was an exceptionally good one would tend to support the increase in compensation for the following year provided *106 that the company continued, as it did, to make money. The volume of business was greater in the tax year than in the preceding year. In addition, a hide dealer of wide experience testified that reasonable compensation for the services of the three officers, based upon all the factual elements involved, would be an amount in excess of that claimed by petitioner. There was a bona fide rendition of services, petitioner was made to prosper thereby, and the amounts paid were clearly not extravagant under the circumstances. An amount paid ostensibly as compensation for services should be regarded as such and a deduction allowed therefor if it does not offend the requirement of reasonableness. We think petitioner's burden has been carried, and therefore disapprove respondent's determination on this issue. The second question is whether petitioner's futures transactions were hedges as distinguished from speculation. If the former, they were executed as a method of insurance against price fluctuation, with resultant losses therefrom deductible in full as ordinary and necessary business expenses. G.C.M. 17322, XV-2 C.B. 151. Otherwise, the losses were capital *107 losses subject to the limitation imposed by section 117 (d) of the Revenue Act of 1936. Commissioner v. Banfield, 122 Fed. (2d) 1017. The Commissioner contends that petitioner has failed to prove that its futures transactions were hedges and therefore were not speculations. Respondent, however, requested a finding of fact, which we have made because it is supported by the evidence, to the effect that - The hide business is speculative and hide dealers generally during the taxable year used the facilities of the Hide Exchange to deal in futures as a protective measure against losses in the operations of their business. Whether petitioner's futures activities in particular were for speculation or for insurance is, of course, "largely a factual question." Kenneth S. Battelle, 47 B.T.A. 117, 125. A hedge has been defined as "a form of price insurance; it is resorted to by business men to avoid the risk of changes in the market price of a commodity. The basic principle of hedging is the maintenance of an even or balanced market position." Commissioner v. Farmers & Ginners Cotton Oil Co., 120 Fed. (2d) 772, *108 certiorari denied, 314 U.S. 683. Thus, the mere dealing in futures for protection would not be sufficient to constitute a hedge, unless the dealings were directly related to the petitioner's dealings in actual hides. The cross-examination conducted by respondent's counsel at the hearing of the present case was directed primarily to eliciting the information that it is impossible to have a perfect hedge in petitioner's business. The reason for this lies in the manner of purchasing the hides. The dealers do not buy a given number of pounds of hides against which they can hedge one hundred percent. They take the total accumulation of any smaller dealers, an amount which cannot be ascertained definitely at any one time. The hides that a dealer may receive during a month, however, can be estimated with a fair degree of accuracy. To the extent that an estimate must be made it is impossible to execute a perfect hedge, and this the petitioner freely admits. But we agree with petitioner, that this element does not change the essential character or purpose of the futures transactions. When wheat is planted, the number of bushels that will be harvested must necessarily *109 be an estimate; yet it is possible to hedge against that estimate. Ben Grote, 41 B.T.A. 247. The same may be said of cotton, and we have held that a true hedge resulted if the grower "did not short himself in a greater amount than he might reasonably have anticipated harvesting." Kenneth S. Battelle, supra, p. 127. In that case we said: - The fact that a taxpayer does not have the commodity on hand at the time he assumes the short position does not preclude him from correctly terming it a hedge so long as he shows his purpose was to offset the production risk of a commodity he expects to have on hand for sale. It is pointed out by respondent that the record does not show petitioner's position in actual hides at any given time during the tax year. He asserts that the monthly average of 600,000 pounds may not be taken as demonstrating petitioner's actual position during any particular month. We do know, however, that the number of pounds of hides on hand or on order from September to February was much greater than at other times during the year; and this being so, we think it plainly exceeded in those months the average *110 of 600,000 pounds. Petitioner was "short" during those months, but its short position never exceeded 520,000 pounds. In our opinion the evidence indicates that petitioner did not short itself in an amount greater than its actuals on hand or what it reasonably anticipated acquiring. Respondent also states that petitioner's purchases and sales of futures were dependent more upon the market, and the dealer's feeling about the market, than upon its actual position in hides. We do not so construc the testimony. One of petitioner's witnesses, another large dealer in hides, testified that if the market trend was good, a dealer (but not having particular reference to petitioner) would hedge less, whereas if it were bad he would hedge more. We understand this evidence to mean that if a dealer believed the market was favorable he would not avail himself of the opportunity of insuring his actuals one hundred percent, since he would be willing to assume what he considered a slight risk; but if he had no confidence in the market at that particular time he would endeavor to secure an offsetting futures contract for all of his estimated actuals. In our opinion this testimony tends to support the *111 view that the futures transactions were executed for insurance rather than speculation. We do not understand that to constitute a true hedge on certain purchases or sales, a dealer must offset every purchase or sale with a corresponding futures contract. The purpose of the hedge is to secure protection or insurance, and if the dealer believes there is little or no risk involved in purchasing certain hides, he is entitled to refrain from securing protection. This does not mean, however, that the futures transactions are any the less hedges when executed in connection with business where the dealer regards as requiring protection. And at any rate, as we have seen, petitioner did not short itself at any time in excess of its estimated actuals position. We hold that petitioner's futures transactions were entered into for insurance protection rather than speculation, and that they constituted hedges, the losses from which are deductible in full. Decision will be entered under Rule 50.